# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTH AMERICAN PETROLEUM CORPORATION USA, *et al.*,[1] | Case No. 10-11707 (CSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: May 17, 2011 at 2:00 p.m. (ET)** |
| | **Obj. Deadline: May 10, 2011 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING (I) SETTLEMENT AGREEMENT AND (II) ASSET TRANSFERS

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to enter into, and approving, that certain settlement agreement (the "Settlement Agreement") by and between the Debtors, Equal Energy U.S. Inc. and its related affiliates (collectively, "Equal"), and Texas Capital Bank, N.A. and Compass Bank (collectively with all lenders to the Credit Agreement (as defined herein) from time to time, the "Lenders") dated April 23, 2011, attached to Exhibit A as Exhibit 1, and transfer of certain assets pursuant to that certain asset sale agreement (the "Equal APA"),[2] dated April 23, 2011,

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or Canadian corporation number, include: North American Petroleum Corporation USA (9766); Prize Petroleum LLC (2460); and Petroflow Energy Ltd. (517-5). The location of the Debtors' corporate headquarters and the Debtors' service address is: 525 South Main Street, Suite 1120, Tulsa, Oklahoma 74103, Attn: Louis G. Schott.

[2] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Equal APA and the Settlement Agreement.

attached to Exhibit A as Exhibit 2.  In support of this Motion, the Debtors respectfully state as follows:[3]

### Jurisdiction and Venue

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are section 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

4.     On May 25, 2010, North American Petroleum Corporation USA ("NAPCUS") and Prize Petroleum LLC each filed voluntary petitions under chapter 11 of the Bankruptcy Code. On August 20, 2010, Petroflow Energy Ltd. filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Debtors' chapter 11 cases. The Debtors' chapter 11 cases are consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). An official committee of unsecured creditors (the "Creditors' Committee") has been appointed by the United States Trustee for the District of Delaware pursuant to section 1102 of the Bankruptcy Code.

---

[3]  Subsequent to the date hereof and prior to the hearing on this Motion, the Debtors will file a declaration on behalf of Sudhin Roy of Kinetic Advisors, LLC, the Debtors' restructuring advisor (the "Roy Declaration") in support of the facts set forth herein.

K&E 18684814

## Resolution of The Adversary Proceedings

5.     After weeks of negotiations, Equal, the Debtors and the Lenders have now reached agreement on the key terms of a settlement and associated asset transfer transaction. Upon closing of the settlement, the Debtors will be positioned to move forward with a chapter 11 plan of reorganization, which they expect will provide substantial recovery to unsecured creditors and reinstate existing equity holders' interests.     As further described below, the Settlement Agreement will provide for full and final resolution of all claims asserted among the parties and satisfy the Lenders' outstanding prepetition claims against the Debtors.     In connection with the Settlement Agreement, the Debtors are seeking authorization to consummate the Equal APA, which will transfer a substantial portion of the Debtors' Oklahoma-based assets to Equal and provide a framework for the parties' ongoing commercial relationship.     The Debtors believe that the transfer of assets and settlement of outstanding claims under the interconnected Equal APA and Settlement Agreement provide the most viable means to resolve outstanding disputes among the parties and clear the way for the Debtors' successful reorganization.     Indeed, the Debtors submit that these arrangements will bring closure to nearly all outstanding issues in these cases, including ultimate dismissal of outstanding counts remaining in the Adversary Proceedings (as defined below), and are essential to preserving value for creditors.     The Debtors therefore respectfully request that the Court approve the Settlement Agreement and Equal APA as set forth herein.

3

6. As the Court is aware, the Debtors have been focused during the course of these chapter 11 cases on resolving complex and litigious issues with Equal and other constituents. In particular, the Debtors have devoted substantial time to resolving outstanding litigation with Equal. On July 14, 2010, the Lenders initiated an adversary proceeding against the Debtors [Docket No. 123] (Adv. Proc. No. 10-51624, Docket No. 1) (the "Lender Adversary Proceeding") seeking a declaratory judgment regarding, among other key issues, the extent of the Debtors' indebtedness to the Lenders and the nature and extent of the Lenders' collateral interests in the Debtors' oil and gas assets. On July 15, 2010, the Debtors initiated an adversary proceeding against Equal [Docket No. 126] (Adv. Proc. No. 10-51675, Docket No. 1) (the "Debtors Adversary Proceeding," and, collectively with the Lender Adversary Proceeding, the "Adversary Proceedings") and Equal filed a motion for payment of administrative expenses [Docket No. 129].

7. The Debtors originally were prepared to have a hearing on all seven counts raised in their complaint, as well as Equal's administrative expense claims, as early as October 2010. However, the Lenders objected to the Debtors' proposed timeline, asserting that four of the counts raised in the Debtors' complaint were intertwined with the lenders' allegations and that the matters would require additional time for discovery. Accordingly, to accommodate Lenders' concerns and avoid stalling litigation progress with further timeline disputes, the Debtors agreed to bifurcate their adversary proceeding with three counts to be heard in November and the remaining four (as requested by the bank lenders) to be heard in April 2011. On August 30, 2010, the Court entered an order approving the proposed schedule submitted by the Debtors and the Lenders pursuant to which the trial for four of the Debtors' counts against Equal and the Lenders claims raised in its adversary proceeding complaint was to be held in April 2011, while

4

counts 1, 2, and 7 of the Debtors' complaint, as well as Equal's administrative expense claim, were set for trial in December 2010.

8.    On February 18, 2011, the Court issued its findings of fact and conclusions of law, in which the Court found:

- in part, for the Debtors and the Lenders, on count 1 (recharacterization of the Cost Recovery Agreement) of the Debtors' complaint;

- in favor of Equal under counts 2 and 7 (fraudulent transfer and Equal's administrative claim); and

- in part, for Equal on Equal's administrative claim.

9.    In addition, the Court ruled the Cost Recovery Agreement void in its entirety, which created significant uncertainty regarding Equal's and the Debtors' respective commercial relationship going forward. Finally, in determining Equal's administrative claim, the Court used the Lender's suggested valuation of $0.08 per barrel, rather than Equal's suggested valuation of $0.50 per barrel. This significantly reduced Equal's ultimate administrative claim against the Estates. On March 4, 2011, Equal filed its motion requesting that the Court reconsider its findings and conclusions. On March 4, 2011, the Court also issued an order (the "March 4 Order") based on its findings of fact and conclusions of law.[4] On March 18, 2011, Equal filed its motion requesting that the Court reconsider the March 4 Order.

10.    The Debtors believe that the March 4 Order gave them leverage in these cases and provided the impetus to explore a global settlement with Equal and the Lenders. Indeed, the rulings set forth in the March 4 Order threatened to effectively transfer approximately $26 million in cash from Equal to the Debtors on account of Equal having to repay to the Debtors

---

[4]    In addition, Equal also filed a motion to reconsider the March 4 Order and to preserve Equal's appeal rights. [Docket No. 688]. Further, the Lenders likewise have filed a motion for clarification and/or amendment of the Court's March 4 Order. [Docket No. 685]. As a result, without the global settlement embodied in the Settlement Agreement and the Equal APA, the Debtors submit that they will be back almost to square one— litigious disputes with key stakeholders in the currently pending Adversary Proceedings.

K&E 18684814

approximately $16.4 million of capital expense payments and eliminate Equal's right to collect an additional approximately $10.1 million of capital expense claims. The March 4 Order ultimately had the effect of causing all parties to reassess the costs and advantages of further litigation and brought the parties to the negotiating table. After weeks of negotiations, in consideration of the Court's Order, the parties reached agreement on the key terms of a transfer of the Debtors' assets to Equal, the consideration to be paid by Equal for such transfer, the payments to be made to Lenders in satisfaction of their secured claims and final settlement of the Debtors' and their estates', Equal's and the Lenders' outstanding claims against one another. The Settlement Agreement and the Equal APA represent the final steps necessary for the Debtors before they can submit a viable plan of reorganization and emerge from chapter 11. The Debtors submit that entry into the agreements is well within their business judgment and respectfully request that the Court grant the relief requested herein.

### The Settlement Agreement

11. Material terms and conditions of the Settlement Agreement include the following:[5]

- ***Transfer of Assets Under Equal APA.*** The Settlement Agreement memorializes the parties' resolution of outstanding claims and is contingent upon the Debtors' transfer of their Oklahoma assets to Equal in exchange for cash consideration pursuant to the Equal APA, as further described below. See Settlement Agreement at 6th Recital.

- ***Release of Claims.*** Equal, the Debtors (including their estates) and the Lenders each will mutually grant each of the other two parties to the Settlement Agreement a release of all claims, including those arising under the Capital Recovery Agreement, that certain farmout agreement dated March 1, 2006 (the "Farmout Agreement") and that certain joint operating agreement dated March 1, 2006 (the "JOA"), as well as claims

---

[5] The summary of the Settlement Agreement presented here is qualified in its entirety by the terms and conditions of the Settlement Agreement. To the extent of any inconsistency between the terms and conditions presented here and those in the Settlement Agreement, the terms and conditions of the Settlement Agreement will control.

K&E 18684814

relating to the Credit Agreement and any claims arising in the Adversary Proceeding. See Settlement Agreement § 7.

- ***Dismissal of Adversary Proceedings.*** Within one business day of the effective date of the Settlement Agreement, the parties agree to file a joint notice with the Court dismissing the Adversary Proceedings. See Settlement Agreement § 12.

- ***Funding of Escrow Account for the Lenders.*** As further described below, the Debtors intend to transfer substantially all of their Oklahoma-based assets to Equal in exchange for $93.5 million cash less certain amounts asserted by Equal, in an amount not less than $5.8 million, that are owed to Equal for certain joint interest billing statements under the JOA and certain other adjustments as provided for in the Equal APA. Upon closing of the Equal APA, the consideration from Equal under the Equal APA (the "Equal APA Consideration") shall be indefeasibly and irrevocably paid to the Escrow Agent for the exclusive benefit of the Lenders, and simultaneously will be paid to Lenders by the Escrow Agent. See Settlement Agreement § 4.

- ***Satisfaction of Credit Agreement Claims.*** In addition, simultaneously with the execution and delivery of a conveyance of the assets transferred by the Debtors under the Equal APA, the Debtors shall (a) irrevocably and indefeasibly pay to the Lenders the difference between the Equal APA Consideration and the $98.0 million (inclusive of currently suspended revenues on deposit at Texas Capital Bank, N.A.), (b) irrevocably and indefeasibly transfer to the Lenders 70% of the Debtors' rights to certain state tax refunds and (c) instruct the Escrow Agent to deliver to the Lenders all funds received from Equal pursuant to the Equal APA. See Settlement Agreement § 5. Such transfers (together with the release of any claims and causes of action against the Lenders) shall be in full and final settlement, satisfaction, release and waiver of any and all claims of the Lenders against the Debtors. See Settlement Agreement § 5.

- ***Conditions to Closing.*** The Settlement Agreement is subject to certain conditions to closing, including approval by the Court of the Settlement Agreement and the Equal APA, as requested herein, continued stay of the Adversary Proceedings, required delivery of documents and funds for closing of the Equal APA and irrevocable and indefeasible delivery to the Lenders of $98.0 million in cash and transfer to the Lenders of the tax rebates. In addition, the Settlement Agreement shall be null and void unless the effective date of the settlement does not occur on or before June 1, 2011. See Settlement Agreement § 11.

12.     The Debtors submit that this Court authorizing the Debtors to enter into the Settlement Agreement is in the Debtors' and their creditors' best interests. The Settlement Agreement maximizes the value of assets transferred pursuant thereto for the Debtors' stakeholders, and provides the means by which a viable business can be reorganized for such stakeholders. It further resolves all litigation with Equal including inevitable confirmation disputes, eliminates considerable litigation costs and uncertainty, secures releases for the Debtors and related parties, and preserves substantial oil and gas assets for the reorganized Debtors on which they will build a successful enterprise post-emergence. Accordingly, the Debtors submit that entry into the Settlement Agreement is in the Debtors' and their creditors' best interests.

## The Equal APA

13.     Settlement of outstanding claims among the parties is contingent upon the Debtors' transfer of certain assets to Equal and Equal's payment of cash consideration to the Debtors (to be further paid over to the Lenders) pursuant to the Equal APA. Indeed, a final resolution of outstanding issues in these cases would not be possible without the transactions contemplated in the Equal APA. The material terms and conditions of the Equal APA include the following:[6]

> • ***Transfer of Assets.*** The Debtors shall transfer to Equal, free and clear of all claims, liens and other encumbrances, all rights, title and interest in all assets owned by the Debtors in Oklahoma relating to lands, equipment and inventory associated with NAPCUS' previous participation under the Farmout Agreement with Equal (as further described in the Equal APA, the "Purchase Properties"). See Equal APA § 2.1.

---

[6]   The summary of the Equal APA presented here is qualified in its entirety by the terms and conditions of the Equal APA. To the extent of any inconsistency between the terms and conditions presented here and those in the Equal APA, the terms and conditions of the Equal APA will control.

K&E 18684814

- **_Consideration._** Equal shall transfer to the Debtors $93.5 million cash, as adjusted for certain amounts asserted by Equal, in an amount not less than $5.8 million, and that are owed to Equal for certain joint interest billing statements under the JOA and certain other adjustments as provided for in the Equal APA. See Equal APA § 2.4.

- **_Working Capital Adjustment._** In the event that closing of the Equal APA occurs after July 1, 2011, the consideration to be paid to the Debtors shall be reduced by the estimated net operating income estimated reasonably and in good faith by Equal and in accordance with prudent industry practice and historical calculations regarding the transferred assets attributable to the transferred assets for the period following the Effective Date. In the event that closing of the Equal APA occurs prior to July 1, 2011, the Debtors shall, notwithstanding such closing, continue to be entitled to the proceeds of production from the transferred assets through July 1, 2011 and shall remain liable for taxes and certain other liabilities attributed to the transferred assets through July 1, 2011. See Equal APA §§ 2.5-2.8.

- **_Assumed Liabilities._** Equal shall assume any and all liabilities attributable to the ownership, operation or use of the Purchase Properties, after July 1, 2011, other than those released or waived under the Settlement Agreement (collectively, the "Assumed Liabilities"). See Equal APA § 2.6(i).

- **_Uphole Zones._** The Debtors and Equal will execute an operating agreement with respect to certain uphole "Shallow Rights" (defined as all right, title, and interest in the oil, gas and other minerals from the surface of the earth to the stratigraphic equivalent of the base of the Mississippi common source of supply, located in Grant County, Oklahoma), such that Equal and NAPCUS will jointly share such uphole interests with respect to the interests held by Equal at that time of NAPCUS drilling and earning under the Farmout Agreement on an equal basis. In addition, the Debtors and Equal will execute new joint operating agreements for each drilling spacing unit designating NAPCUS as the operator of these uphole zones. See Equal APA § 3.1.

- **_Assignment of Contracts._** Pursuant to the Equal APA, the Debtors shall assume, to the extent not previously assumed, pursuant to section 365(a) of the Bankruptcy Code and assign, pursuant to sections 363(b) and (m) and 365(f) of the Bankruptcy Code, certain Assigned Contracts set forth on Schedule 1 to the Equal APA. All cure amounts for such Assigned Contracts shall be paid by Equal prior to the assumption and assignment thereof, unless otherwise agreed to by Equal and the contract counterparty. See Equal APA § 12.1.

9

- ***Exclusivity.*** Subject to Equal's payment of the Escrow Deposit, upon execution of the Equal APA, the Debtors agreed to suspend all marketing efforts unless otherwise ordered by the Court or to fulfill the Debtors' fiduciary duties. See Equal APA § 15.1.

14.     Debtors' entry into the Equal APA is a cornerstone for the entire settlement among the Lenders, the Debtors and Equal and thus critical to the Debtors' reorganization efforts. Accordingly, the Debtors submit that the Court's approval of this Motion authorizing the Debtors to enter into the Equal APA is in the Debtors' and their creditors' best interests. The Equal APA will maximize the value of assets transferred pursuant thereto and enables the parties to move forward with the Settlement Agreement which will provide closure to all litigation with Equal, provide a source of funds for satisfaction of Lenders' secured claims, leave substantial value for other constituents and secure releases for the Debtors. Accordingly, the Debtors submit that entry into the Equal APA is in the Debtors' and their creditors' best interests and should be approved by the Court.

### Lender Discounted Payoff

15.     The Lenders have calculated that their outstanding principal, default interest, attorneys' fees, and costs currently exceed $113 million. Under the Settlement Agreement, the Lenders are to be paid $98 million cash on the Settlement Agreement effective date and receive an assignment of certain tax refunds/rebates estimated to pay approximately $3 million over three years beginning in July 2012. In other words, the Lenders are accepting a discount of over $12 million.

### Relief Requested

16.     The Debtors seek entry of an order authorizing them to enter into, and approving, the Settlement Agreement and the Equal APA, and authorizing the Debtors' performance of any and all acts necessary or useful to implement the Settlement Agreement and the Equal APA.

10

**Basis for Relief**

**I.     The Court Should Approve the Debtors' Entry into the Settlement Agreement**

       **A.     Approval of the Settlement Agreement is Warranted Under Bankruptcy Rule 9019**

17.     Compromises are tools for expediting the administration of the case and reducing administrative costs and are favored in bankruptcy. Meyers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."); see also In re Nutraquest, Inc., 434 F.3d 639, 644 (3d Cir. 2006).

18.     Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. See In re Penn Cent. Transp. Co., 596 F.2d 1102 (3d Cir. 1979) ("'administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims . . . .'"), quoting In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968). In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimated the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." See In re Penn Cent. Transp. Co., 596 F.2d 1127, 1153 (3d Cir. 1979); see also In re Marvel Entm't Grp., Inc., 222 B.R. 243 (D. Del. 1998) (quoting, In re Louise's Inc., 211 B.R. 798, 801 (D. Del 1997)

11

(describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

19.     More recently, the Third Circuit Court of Appeals enumerated the following four-factor test to be used in deciding whether a settlement should be approved:    "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."   In re RFE Industries, Inc., 283 F.3d 159, 165 (3d Cir. 2002) (citation omitted).   No one factor is determinative and instead, the Court should "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal."   Martin, 91 F.3d at 393.   The Court should not substitute its judgment for that of the debtor.   See In re Neshaminy Office Bldg. Assocs., 62 B.R. at 803.   Moreover, the Court should not decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness.   See In re W.T. Grant and Co., 699 F.2d 599,608 (2d Cir. 1983), cert denied, 464 U.S. 22 (1983).   The balance of factors weigh in favor of approving the Settlement Agreement and the transactions contemplated therein.

20.     Probability of Success in the Litigation:   Although the Debtors believe that they will prevail against Equal's currently pending challenges to the Court's March 4 Order, as well as on the outstanding counts in the Adversary Proceedings, there is still a real chance that continued litigation will bring about an unfavorable result for the Debtors.   Indeed, Equal has indicated that it believes that it will prevail.   Moreover, the Debtors could be exposed to a further number of years of litigation, in light of likely appeals of any judgment in the Debtors' favor. Additionally, certain issues in dispute will not even be heard until June, 2011 and, while the

12

outcome may be predicted, such outcome remains uncertain. Given that uncertainty, and in light of the fact that the Settlement Agreement reflects the effects of the March 4 Order, the risk and time-adjusted value of continuing to pursue litigation against Equal supports settlement.

21. <u>Complexity of the Litigation</u>: As this Court has acknowledged several times, the Debtors' adversary proceedings in these cases are complex and time-consuming. Indeed, the entire framework for a restructuring solution here depends on the outcome of such litigation as it goes to the core of the Debtors' ability to operate going forward and the composition of their balance sheet. Moreover, the appeal process in connection with the litigation could take an additional number of years to compete, resulting in significant uncertainty regarding the ultimate value of the Debtors' assets and viability. Even if successful, the Debtors' associated litigation award may not provide the same material benefits to the Debtors' estates compared to those provided under the Settlement Agreement and provided in relatively short order.

22. <u>Paramount Interest of Creditors</u>: Given the relatively unique nature of these cases and the Debtors' businesses the majority of costs incurred to date in these cases, including for professionals' fees and expenses, have been on account of litigation against Equal. These costs will continue to mount, to the detriment of the Debtors' creditors, if the Debtors' requested relief is not approved. Additionally, the Debtors would expect that absent the present settlements with each of Equal and the Lenders, they each will arm themselves for a confirmation battle that will take its toll on the distributable value available for other creditors and stakeholders. Also, the Lenders have recently quantified their claims against the Debtors' estates at over $113 million in secured claims. They have agreed, pursuant to the Settlement Agreement, to accept a reduction of over $12 million on their claims and to a full and final settlement and release of those claims. More distributable value will, thus, be available to the Debtors' unsecured creditors and

potentially equity holders. Further, Equal is the largest of the Debtors' unsecured creditors and its claims are also being settled and released favorably to the Debtors' other stakeholders.

23.     Finally, the Debtors do not believe that they could achieve a greater monetization of their assets than through the transfer of such assets to Equal under the Settlement Agreement and Equal APA. A formal auction of those assets would take time and result in substantial transaction costs to the Debtors' estates with no realistic potential for up-side. Indeed, as detailed in the Roy Declaration, the Debtors have attempted to market their assets since shortly after commencing these cases. However, despite the Debtors' efforts, no viable alternative offer has materialized. Also, considering Equal's vested interests in the Debtors' assets, it is unlikely, with any further time or process, that another buyer would have the motivation to offer a superior price. The Settlement Agreement and Equal APA likewise provide for the Debtors' retention of valuable working interests and operating rights in certain "uphole zones," and without any litigation as to ownership rights in such property, on the basis of which the Debtors will successfully reorganize their business and distribute value to their creditors and other stakeholders through a forthcoming chapter 11 plan.

24.     Accordingly, the Debtors submit that the Settlement Agreement, in the exercise of their business judgment, is fair and reasonable and in the best interests of the Debtors' estates and their creditors. Thus, the requested relief is warranted here.

**B.      Approval of the Settlement Agreement is also Warranted Under Section 363**

25.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). It is well-established in this jurisdiction that a debtor may sell assets outside of a plan of reorganization pursuant to section 363(b) of the Bankruptcy Code if there is a good business reason for doing so. See, e.g., Martin, 91 F.3d at 395; In re Montgomery

14

Ward Holding Corp., 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175 (Bankr. D. Del. 1991); In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001).

26.     Courts typically consider the following factors in determining whether a proposed use of assets satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See, e.g., In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13-14 and n.2 (D. N.J. Mar. 26, 1997).

27.     A sound business purpose for the use or sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997); In re Integrated Res., 147 B.R. at 659.

28.     Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action

K&E 18684814

taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting

Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the

business judgment rule, then the transaction in question should be approved under

section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great

deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re

First Wellington Canyon Assocs.), 1989 WL 106838, at *3 (N.D. Ill. 1989) ("Under this test, the

debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's

decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

29.    The requirements under section 363 of the Bankruptcy Code that a sale or use of

assets preserve the value of the estate for a debtor's creditors or interest holders and be an

exercise of sound business judgment mirror the fourth-prong Bankruptcy Rule 9019 test. See

In re RFE Industries, Inc., 283 F.3d at 165. As previously described, negotiations with Equal

and the Lenders were conducted at arm's-length in good faith and were extensive. The Debtors'

exercise of sound business judgment compels them to enter into the Settlement Agreement to

preserve distributable value for creditors and equity holders in these cases. Accordingly, for the

reasons set forth herein, in addition to satisfying the standard of Bankruptcy Rule 9019, the

Debtors' entry into the Settlement Agreement meets the standard of section 363 of the

Bankruptcy Code.

## II.    The Court Should Approve the Equal APA

### A.    The Equal APA is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

30.    Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent

16

part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

31.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  See, e.g., Martin, 91 F.3d at 395; In re Trans World Airlines, Inc., No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

32.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:    (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  See In re Delaware & Hudson Ry., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); In re United Healthcare Sys., Inc., No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at * 13-14 and n.2 (D.N.J. March 26, 1997). The Delaware & Hudson court further held that:

> [o]nce a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

In re Delaware & Hudson Ry., 124 B.R. at 176.

K&E 18684814

33. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. See, e.g., In re Abbotts Dairies of Pa., Inc., 788 F.2d 143 (3rd Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983). In fact, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See Food Barn, 107 F.3d at 564-65 (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); In re Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

34. This Court and others uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See In re Montgomery Ward Holding Corp., Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); In re Fruehauf Trailer Corp., Case No. 96-01563 (PJW) (Bankr. D. Del. Jan. 31, 1997). See also In re Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets").

35. Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." Creditors' Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the

18

directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1). Indeed, when applying the "business judgment" standard, courts show great deference to a debtor's business decisions. See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), Case No. 89C593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion").

36. The Debtors submit that the Equal APA satisfies the "sound business reason test." The prompt sale of the Purchase Properties and assumption of the Assumed Liabilities presents the best opportunity to maximize the value for the estates in light of the need to preserve the value of the assets and to manage and transition the Purchase Properties to a purchaser. Moreover, as stated above and in the Roy Declaration, the Debtors have actively marketed their assets for nearly the entirety of these cases to no avail. Notwithstanding their efforts, the Debtors have not succeeded in finding an alternative partner, as potential buyers were deterred from making bonafide offers by the uncertainty arising from the Debtors' ongoing litigation with Equal in the Adversary Proceedings and the parties' now-concluded arbitration dispute. The Debtors therefore believe that Equal has presented the most viable option for the Debtors' future business and the Equal APA is intricately tied to the global settlement among the Debtors, the Lenders and Equal. Further, a prompt sale of the Purchase Properties and assumption of the

K&E 18684814

Assumed Liabilities will allow the Debtors to finalize their plan of reorganization, and coupled with the Settlement Agreement, will allow the Debtors to exit bankruptcy expeditiously.

37.     Accordingly, the Debtors request that this Court make a finding that the proposed sale pursuant to the Equal APA is a proper exercise of its business judgment and is authorized as requested herein.

**B.     The Sale of the Purchase Properties Free and Clear of Encumbrances and Other Interests is Authorized by Section 363(f) of the Bankruptcy Code**

38.     This Court has authority to authorize the sale of the Acquired Assets free and clear of liens, claims, encumbrances and other interests.   See 11 U.S.C. § 363(f).   Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property free and clear of any lien, claim or interest of an entity in such property if, among other things:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

39.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

40.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchase Properties "free and clear" of liens and interests.   In re Dundee Equity Corp., Case No.

20

89B10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f)

is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the

conditions of § 363(f) have been met"); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),

94 B.R. 343, 345 (E.D. Pa. 1988) (same); see also Michigan Employment Sec. Comm'n v.

Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991)

(holding that the court may approve the sale "free and clear" provided at least one of the

subsections of Bankruptcy Code section 363(f) is met).

41.     One or more of the tests of section 363(f) will be satisfied with respect to the sale

of the Purchase Properties.  In particular, at least section 363(f)(2) will be met in connection with

the transactions proposed because each of the parties holding liens on the Purchase Properties,

will consent, or absent any objection to this Motion, will be deemed to have consented to, the

sale.

42.     Moreover, section 363(f) is satisfied in such instance because all holders of liens,

claims, encumbrances and other interests could be compelled to accept a money satisfaction of

their liens in legal or equitable proceedings in accordance with section 363(f)(5).  Such legal or

equitable proceedings include proceedings to confirm a chapter 11 plan, under which the holder

of a lien may be compelled to accept payment in satisfaction of its lien pursuant to

section 1129(b)(2)(a).  Accordingly, section 363(f) authorizes the transfer and conveyance of the

Purchase Properties free and clear any such Liens.

C.     **Equal is a Good Faith Purchaser and is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code and the Transfer of the Purchase Properties Does Not Violate Section 363(n)**

43.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such

21

authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

44.     While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pa., Inc., held that:

> [t]he requirement that a [buyer] act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [Proposed Buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted).

45.     The Equal APA has been, and upon execution will have been, negotiated at arm's length and in good faith. Thus, Equal should be entitled to the full protections of section 363(m) of the Bankruptcy Code. A party would have to show fraud or collusion between a purchaser and a debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. See id.; see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika Films, 57th, Inc., Case No. 97 Civ. 2239, 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998)

46.     The Debtors and Equal have engaged in thorough and lengthy arm's-length negotiations over the terms of the Equal APA and the Settlement Agreement, and there has been no fraud or collusion in those negotiations. Upon execution of the Equal APA, and under the terms of the Equal APA, Equal recognized that the Debtors were free to deal with any other party

22

interested in acquiring the Purchase Properties. Additionally, all payments to be made by Equal and other agreements or arrangements entered into by Equal in connection with the sale have been disclosed.

47. In this case, there is no indication of fraud or improper insider dealing of any kind. The Equal APA does not constitute an avoidable transaction pursuant to section 363(n) and Equal should receive the protections afforded good faith purchasers by section 363(m). Accordingly, the Debtors request that this Court make a finding that the Equal APA was negotiated and executed at arm's length and is entitled to the full protections of section 363(m) of Bankruptcy Code.

**D. Assumption and Assignment of the Assigned Contracts is Authorized by Section 365 of the Bankruptcy Code**

*(i) Assumption and Assignment Based on Debtors' Business Judgment*

48. Section 365(a) and (b) of the Bankruptcy Code authorizes debtors in possession to assume executory contracts or unexpired leases subject to the court's approval, and requires such debtors in possession to satisfy certain requirements at the time of assumption. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ...;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such

23

> contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

49.     The standard that is applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. See Sharon Steel Corp. v. National Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3rd Cir. 1989). See also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (superseded in part by 11 U.S.C. § 1113) (describing business judgment test as "traditional"); In re III Enter., Inc. V, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted), aff'd, 169 B.R. 551 (E.D. Pa. 1994).

50.     It is well-established that a court should approve a debtor's motion to assume or reject an executory contract if the debtor's decision is based on its sound "business judgment." See In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"); In re Network Access Solutions, 330 B.R. at 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Decora Industries, Inc., No. 00-4459(JJF), 2002 WL 32332749, at *8 (D. Del. May 20, 2002); Phar Mor, Inc. v. Strouss Bldg. Assocs., 204 B.R. 948, 952 (N.D. Ohio 1997) ("Courts should generally defer to a debtor's decision whether to reject an executory contract.") (citation omitted).[7]

---

[7]     Further, "[n]othing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent." In re Network Access Solutions, Corp., 330 B.R. at 74 (citation omitted). While "[s]ection 363 of the Bankruptcy Code allows a debtor to ... modify contracts ... [t]o the extent they are outside the ordinary course of business, court approval is necessary." Id. Regardless, "[t]here is ... no discernable difference in the notice requirements or standard for approval under section 363 and 365." Id.

K&E 18684814

51.     To determine if the business judgment test is met, the court "is required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. at 239 ("This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate"). Specifically, a court should find that the debtor acted prudently, "on an informed basis, in good faith, and with the honest belief that the assumption" is in the best interests of the debtor and the estate. Network Access Solutions, 330 B.R. at 75. Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion. See Computer Sales Int'l, Inc. v. Federal Mogul (In re Federal Mogul Global, Inc.), 293 B.R. 124, 126 (D. Del. 2003); Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985).

52.     In the present case, the Debtors' assumption and assignment of the Assigned Contracts to Equal meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Equal APA will provide significant benefits to the Debtors' estates. The Assigned Contracts are necessary for Equal to conduct the business and Equal likely would not purchase the Purchase Properties without them. Further, pursuant to the terms of the proposed Equal APA, Equal will pay all cure costs required to be paid pursuant to section 365 of the Bankruptcy Code. Because the Debtors cannot otherwise obtain the benefits of the Equal APA, and such cure payments are expected to be borne by Equal in accordance with the terms of the Equal APA, the assumption of the Assigned Contracts is a sound exercise of the Debtors' business judgment.

K&E 18684814

*(ii)* *Adequate Assurance of Future Performance Provided Under the Equal APA*

53.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.    See 11 U.S.C. § 365(f)(2).    Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.    See, e.g., In re Bygaph, Inc., 596, 605-606 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

54.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

55.    As set forth directly below, parties to the Assigned Contracts will have the opportunity to request additional adequate assurance of future performance.    Accordingly, the Debtors believe that their proposed assignment and assumption of the Assigned Contracts meets the standards set forth in section 365(a) of the Bankruptcy Code.

*Sufficient Notice has Been Provided of Assignment of the Assigned Contracts and Proposed Cure Amounts*

56.     Under Bankruptcy Rule 2002, the Debtors are required to notify creditors of the proposed sale of the Purchase Properties, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections. As described below, the Debtors intend to serve a notice of the proposed sale of the Purchase Properties, substantially in the form attached hereto as **Exhibit B** (the "Sale Notice"), on the Notice Parties (as defined below). ***The Debtors reserve the right to amend and modify the schedule of Assigned Contracts on Exhibit 1 at any time between the date hereof and the closing of the Equal APA.*** In addition, it is necessary to establish an orderly and fair process by which the Debtors and the counterparties to the Assigned Contracts can establish the cure obligations, if any, necessary to be paid under section 365 of the Bankruptcy Code, and by which contract counterparties can request additional information regarding adequate assurance of future payment.

57.     With respect to the Assigned Contracts that the Debtors are proposing to assume and assign pursuant to this Motion, as part of the Sale Notice, the Debtors will provide notice to all counterparties to the Assigned Contracts notifying such parties that their contracts are being assumed and assigned under the Equal APA. Further, as part of the Sale Notice, the Debtors will provide notice to those parties of cure amounts (the "Cure Amounts"), if any, that may be owing under those contracts.

58.     The Debtors will serve the Sale Notice on or around April 25, 2011 on the following entities (the "Notice Parties"):

A.      all parties entitled to receive notice as of the date hereof pursuant to Bankruptcy Rule 2002(a)(2);

27

B.	all parties known to the Debtors who have an interest in or rights to the Purchase Properties;

C.	all entities who have recorded in the public record any lien, interest or encumbrance in or upon the Purchase Properties;

D.	all parties to the Debtors' executory contracts, unexpired leases and real property easements (as and when identified) that will be assumed and assigned in connection with the sale of the Purchase Properties;

E.	the Office of the United States Trustee for the District of Delaware;

F.	all taxing authorities having jurisdiction over any of the Purchase Properties, including the Internal Revenue Service;

G.	counsel for the Creditors' Committee;

H.	counsel for the agents for the Debtors' prepetition secured lenders;

I.	all persons known or reasonably believed to have expressed an interest in acquiring the Purchase Properties; and

J.	counsel for Equal.

59.	Attached as Exhibit 1 to the Sale Notice is a schedule of all Assigned Contracts and related Cure Amounts, to the extent applicable. Accordingly, parties to the Assigned Contracts are on proper notice of the proposed assumption and assignment to Equal of such contracts.

60.	The Debtors request that their services of the Sale Notice on the Notice Parties be deemed adequate and sufficient. The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale, the Cure Amounts and the hearing on this Motion to the Debtors' creditors and other parties in interest that are entitled to notice of the sale, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Purchase Properties.

28

61. In addition, the Sale Notice is sufficient to provide notice to counterparties to the Debtors' prepetition exceutory contracts to be assumed and assigned to Equal under the Equal APA. The Sale Notice identifies the Assigned Contracts to be assumed and assigned, as well as the Cure Amount.

62. The Debtors request that any counterparty to an Assigned Contract that wishes to obtain adequate assurance information regarding Equal must notify the Debtors in writing at: (a) Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Paul Wierbicki, e-mail: paul.wierbicki@kirkland.com; and North American Petroleum Corporation USA, 525 South Main Street, Suite 1120, Tulsa, Oklahoma 74103, Attn: Louis G. Schott, on or before May 10, 2011 at 4:00 p.m. (prevailing Eastern Time) (the "Request for Adequate Assurance"). The Request for Adequate Assurance must include an e-mail address or postal address for overnight courier delivery to which a response to such information request can be sent.

63. If a counterparty to an Assigned Contract timely submits a Request for Adequate Assurance, the Debtors shall serve such party with any non-confidential information relating to adequate assurance received by the Debtors by e-mail or overnight delivery on or before May 12, 2011. A counterparty to an Assigned Contract that timely submits a Request for Adequate Assurance shall have until **May 16, 2011 at 4:00 p.m. (prevailing Eastern Time)** by which to file an objection to adequate assurance of future performance by any of the bidders. If a counterparty to an Assigned Contract does not timely submit a Request for Adequate Assurance, does not timely object to adequate assurance of future performance by Equal **on or before May 16, 2011 at 4:00 p.m. (prevailing Eastern Time)**, this Court may enter an order forever barring such counterparty to an Assigned Contract from objecting to adequate assurance of future performance.

K&E 18684814

64.     Except as may otherwise be agreed to by the parties to an Assigned Contract, at or prior to the closing of the sale of the Purchase Properties, Equal and the Debtors shall each pay their share, as set forth in the Equal APA, in curing those defaults under the Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (a) payment of the undisputed Cure Amounts or (b) reserving amounts with respect to the disputed Cure Amounts.

*(iv)     Assignment Permitted, Notwithstanding Anti-Assignment Provisions*

65.     To assist in the assumption, assignment and sale of the Assigned Contracts and the Purchase Properties, the Debtors also request that the Court enter an order providing that anti-assignment provisions therein under applicable law shall not restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and are deemed and found to be unenforceable anti-assignment provisions under sections 105(a) or 365(f) of the Bankruptcy Code.

66.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

11 U.S.C. § 365(f)(l).

67.     Section 365(f)(l), by operation of law, invalidates provisions or applicable law that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. Circle K Corp. (In re Circle K Corp.), 127 F.3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate

the purposes of section 365"), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating a right to terminate a lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

68.     Other courts have recognized that provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 356(f) [sic], courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(1) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987).

69.     Thus, the Debtors request that any anti-assignment provisions or applicable law be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Assigned Contracts and be deemed and found to be unenforceable anti-assignment provisions under the Bankruptcy Code pursuant to sections 105(a) and 365(f) of the Bankruptcy Code.

K&E 18684814

**E.    The Debtors Will Retain or Have Reasonable Access to their Business Records to Administer Their Chapter 11 Cases**

70.    Pursuant to Section 7.5 of the Equal APA:

> For a period of twenty-four (24) months after the Closing Date (the "Transition Period"), each Party and their respective representatives and successors, and the Creditors' Committee or any other official committee of unsecured creditors of Sellers or their designee, shall have reasonable access to, and each shall have the right to photocopy, all books and records relating to the Properties, in the possession of the other Party to the extent that such access may reasonably be required by such Party in connection with matters relating to or affected by the operation of the Properties. During the Transition Period, and only to the extent that Purchaser's operation of the Properties is not interrupted in any material respect, Purchaser agrees to provide Sellers, during ordinary business hours and upon reasonable notice and at any Sellers' request, with reasonable access to employees of Purchaser for purposes of winding down the estate of Sellers. Such access shall be afforded by the Party in possession of such books and records upon receipt of reasonable advance notice and during normal business hours; provided, however, that (i) any such investigation shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any Party or its affiliates (ii) no Party shall be required to take any action which would constitute a waiver of the attorney-client privilege and (iii) no Party need supply the other Party with any information which such party is under a legal obligation not to supply. The Party exercising this right of access shall be solely responsible for any costs or expenses incurred by it pursuant to this Section 7.5. If the Party in possession of such books and records shall desire to dispose of any such books and records upon or prior to the expiration the Transition Period, such Party shall, prior to such disposition, give the other Party a reasonable opportunity at such other Party's expense, to segregate and remove such books and records as such other Party may select.

71.    *As such, the Debtors will have adequate access to their books and records for purposes of administering their estates.*[8]

---

[8]    See Local Bankruptcy Rule 6004-1(b)(iv)(J).

### III. Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

72.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d). *The Debtors request that any order approving the Equal APA and the assumption and assignment of the Assigned Contracts be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.*[9]

73.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to FED. R. BANKR. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, the leading treatise on bankruptcy suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, Collier's suggests that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

74.     To maximize the value received for the Purchase Properties, the Debtors seek to close the sale as soon as possible after the hearing on the Motion.  Absent an expedient hearing

---

[9]     See Local Bankruptcy Rule 6004-1(b)(iv)(O).

K&E 18684814

on, approval and closing of the sale, the Debtors will continue to incur extensive costs associated with further administering the chapter 11 cases and preserving their operational assets. The sooner the Equal APA is allowed the close the sooner the Debtors will be in a position to submit a chapter 11 plan and emerge from bankruptcy. Time further spent in bankruptcy will, in contrast, result in further incurrence of fees and expenses. Moreover, the Equal APA is inextricably linked to the Settlement Agreement, which by its terms must close on or before June 1, 2011. Accordingly, the Debtors hereby request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

### Notice

75. Notice of this motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the co-agents for the Debtors' prepetition secured lenders; (c) Equal; (d) the Lenders; (e) the Creditors' Committee; (f) the Internal Revenue Service; (g) the Securities Exchange Commission; (h) the Delaware Secretary of State; (i) the Delaware Secretary of the Treasury; and (j) all entities that have filed a request for service of filings in the chapter 11 cases pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

34

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, authorizing the Debtors to enter into, and approving, the Settlement Agreement and the Equal APA and granting such other and further relief as is just and proper.

Dated: April 25, 2011

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
919 Market Street, Suite 1000
Wilmington, Delaware 19801-3062
Telephone:     (302) 426-1189
Facsimile:      (302) 426-9193

- and -

Morton Branzburg (admitted *pro hac vice*)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-2700
Facsimile:      (215) 568-6603

- and -

**KIRKLAND & ELLIS LLP**
David R. Seligman, P.C. (admitted *pro hac vice*)
Ryan Blaine Bennett (admitted *pro hac vice*)
Paul Wierbicki (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

K&E 18684814